**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **BRYON K. CHAMP,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No. 3:19-CV-26-MAB** |
| | ) |
| **SHIRLEY FORCUM, ET AL.,** | ) |
| | ) |
| **Defendants.** | ) |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

For the reasons discussed below, as well as those stated in the Court's Order Dismissing Case With Prejudice (Doc. 217), the Court imposes the sanction of DISMISSAL with PREJUDICE against Plaintiff. This case is CLOSED, and the Clerk of Court is DIRECTED to enter judgment accordingly.

    I.    *Background and Procedural History*

        a.   *Initial Proceedings and Appointment of Counsel*

Plaintiff Bryon Champ filed this civil rights action on January 7, 2019, for alleged events that occurred while he was a pretrial detainee at Chester Mental Health Center (hereinafter "Chester") (Docs. 1, 14).[1] After conducting a preliminary review pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on four counts against Defendants:

    **Count 1:** Kevin Hayman and Scott [Jausel] retaliated against Plaintiff for his "legal work" by restraining Plaintiff to his room in violation of the First Amendment.

---

[1] Additional details regarding the contents of Plaintiff's Complaint and the underlying facts can be found in Plaintiff's Complaint (Doc. 1), the Court's preliminary review Order (Doc. 14), and the Court's Order granting in part and denying in part Defendants' Motion for Partial Summary Judgment (Doc. 123).

**Count 2:** Hayman used excessive force against Plaintiff in violation of the Fourteenth Amendment when he shoved Plaintiff up against the wall and placed his hands around his neck.

**Count 3:** [Jausel] failed to intervene to stop the excessive force used by Hayman in violation of the Fourteenth Amendment.

**Count 4:** Shirley Forcum moved Plaintiff from Green Level to Red Level without prior notification or a hearing in violation of Plaintiff's due process rights.

 (Doc. 14, p. 4).

This case moved beyond the exhaustion of administrative remedies stage in October 2019 (Doc. 44) and was assigned to the undersigned shortly thereafter (*see* Docs. 47, 52). Roughly one year later, in October 2020, Defendants filed a motion for sanctions which alleged that Plaintiff refused to go forward with his scheduled video deposition, even though he admitted to having received notice of the deposition and appeared via video for the deposition (*see* Doc. 62). In that same month, the Court received additional briefing (Docs. 64, 68), held an oral argument on the motion for sanctions (Doc. 71), and permitted Defendants to file an amended motion for sanctions (Doc. 72). Ultimately, by order dated February 25, 2021, the Court denied Defendants' amended motion for sanctions based upon Plaintiff's representations that he was confused about the discovery process as a *pro se* litigant (Doc. 78). However, the Court noted that Plaintiff's failure to participate in a properly noticed and scheduled deposition was quite troubling, and Plaintiff was cautioned that "he must comply with the Federal Rules of Civil Procedure and Court orders. A failure to comply in the future may, in fact, lead to sanctions." (*Id*. at p. 2).

Around the same time the Court was considering Defendants' amended motion for sanctions (Doc. 72), Plaintiff filed a motion for Court-appointed counsel (Doc. 73). That motion was denied on November 23, 2020, because Plaintiff did not specify whether he had attempted to secure counsel on his own (Doc. 74). Several months later, on February 4, 2021, Plaintiff filed a second motion to appoint counsel (Doc. 77). Plaintiff's second motion to appoint was granted on May 28, 2021 (Doc. 80), and attorney Jerome Murphy was appointed to represent Plaintiff (Doc. 81).

Mr. Murphy entered his appearance on Plaintiff's behalf on June 10, 2021 (Doc. 82). From that date onwards, Mr. Murphy worked diligently to conduct discovery on Plaintiff's behalf. Defendants then filed a motion for partial summary judgment and supporting memorandum on February 17, 2023 (Doc. 118). Plaintiff, through counsel, filed a response in opposition on March 24, 2023 (Doc. 121). The Court granted in part and denied in part the motion for partial summary judgment on September 11, 2023 (Doc. 123). Specifically, Defendants' motion for summary judgment on Plaintiff's due process claim against Defendant Shirley Forcum was granted and Defendant Forcum was dismissed (*Id.* at pp. 9-12). However, Defendants Kevin Hayman and Scott Jausel's motion for summary judgment on Plaintiff's retaliation claim was denied (*Id.* at pp. 4-9, 13). Therefore, the case was set to proceed to trial on the following: (1) Plaintiff's retaliation claim against Defendants Hayman and Jausel; (2) Plaintiff's excessive force claim against Defendant Hayman; and (3) Plaintiff's failure to intervene claim against Defendant Jausel (*Id.* at pp. 4-9, 13).

On November 13, 2023, Mr. Murphy filed a motion to withdraw as Plaintiff's Court-appointed counsel (Doc. 137). Mr. Murphy explained that while he had worked diligently to represent Plaintiff through discovery and summary judgment, irreconcilable differences had arisen between Mr. Murphy and Plaintiff related to trial strategy and how best to prosecute this action (*see generally Id.*). In order to fully understand Plaintiff's position (as opposed to his appointed counsel's), the Court provided Plaintiff with a deadline to respond to Mr. Murphy's motion (*see* Doc. 146). Plaintiff filed a response on December 12, 2023, which argued that Mr. Murphy's motion should be denied unless Plaintiff is assured that he will be appointed new counsel by the Court (Doc. 147). Plaintiff also filed a motion to appoint new counsel on January 4, 2024, which generally raised the same concerns (Doc. 148). Finally, on January 22, 2024, the Court granted Mr. Murphy's motion to withdraw and denied Plaintiff's motion to appoint new counsel (Doc. 153). In granting Mr. Murphy's motion, the Court observed that Plaintiff had not disputed any of the contentions Mr. Murphy made in his motion to withdraw concerning the irreconcilable differences that precluded the attorney-client relationship from continuing (Id. at p. 2-4). Rather, Plaintiff only argued that he wanted assurances that new counsel would be appointed to represent him (*Id.* at p. 2-4). Ultimately, the Court granted the motion to withdraw as Mr. Murphy's representations were unrebutted and it would be impossible for the attorney-client relationship to continue (*Id.* at p. 4).[2]

---

[2] In some instances, the Court will hold a hearing on an attorney's motion to withdraw and go into an *ex parte* session with the attorney and the client to assess whether irreconcilable differences truly prevent the relationship from continuing. However, here, because Plaintiff did not dispute or take issue with Mr. Murphy's representations concerning the breakdown in the attorney-client relationship, the Court determined that a hearing on the motion to withdraw was not necessary.

The Court then explained at length why Plaintiff's motion to appoint new counsel was denied (*Id.* at pp. 4-7). Significantly, the Court's Order emphasized that the decision to appoint counsel is discretionary, and the Court is not obligated to appoint counsel again, just because it had done so in the past (*Id.* at p. 5) (citing *Wilborn v. Ealey*, 881 F.3d 998, 1008 (7th Cir. 2018)). The Court considered and determined that Plaintiff should not be appointed new counsel because: (1) Plaintiff's actions and mentality contributed to the irreconcilable differences between him and appointed counsel; (2) Plaintiff's filings with the Court while still represented by counsel demonstrated his inability to communicate and cooperatively work with appointed counsel; and (3) Plaintiff had failed to demonstrate why he was not competent to represent himself at trial, particularly given Plaintiff's ability to take advantage of Mr. Murphy's filings and discovery materials in preparation for trial (*Id.* at pp. 6-7).

Thereafter, Plaintiff filed another motion to appoint counsel on March 8, 2024 (Doc. 158). That motion was denied because the Court had already addressed and rejected Plaintiff's arguments in its prior Order (Doc. 160).

### b.  *Pretrial Proceedings and the Final Pretrial Conference*

After Mr. Murphy was permitted to withdraw, this matter was set for trial in September 2024. However, Defendants moved to continue the Final Pretrial Conference and trial setting because Defendants' lead counsel had a medically necessitated surgery scheduled just a few days before the Final Pretrial Conference (*see* Doc. 164). After a hearing on Defendants' motion, the request to continue was granted (Doc. 175) and this case was assigned a No. 2 jury trial setting for November 12, 2024 (Doc. 176). However,

as November approached, the No. 1 trial setting for November 12th remained firm and this case was reset for trial in February 2025 (Doc. 178). After an additional one-week continuance was granted (Doc. 181), this case was set for a Final Pretrial Conference on January 22, 2025, and a jury trial on February 11, 2025 (Docs. 182, 183).

On December 30, 2024, the Court entered an Order setting all remaining pretrial deadlines (Doc. 187). Furthermore, to cut down on confusion prior to the Final Pretrial Conference, the Court *sua sponte* prepared an additional Order which spelled out the remaining pretrial deadlines, made additional filing accommodations in light of Plaintiff's *pro se* status, provided templates, and detailed what the parties should be prepared to discuss at the Final Pretrial Conference on January 22, 2025 (Doc. 196).

Plaintiff filed a motion for recruitment of counsel on January 16, 2025 (Doc. 201). The Court rejected that motion one day later because Plaintiff did not provide any additional justifications as to why the Court should appoint him counsel (Doc. 202). Furthermore, the Court reiterated that Plaintiff did not have any right to Court-appointed counsel in this *civil* lawsuit that he chose to file (*Id.*).

The Final Pretrial Conference was held in person on January 22, 2025 (Doc. 203). The conference began smoothly, and the Court and parties worked through Defendants' motion in limine and discussed anticipated witnesses and evidence (*see generally* Doc. 220). Unfortunately, however, the hearing took a turn for the worse and Plaintiff's attitude became increasingly combative. For instance, when the Court ruled that Plaintiff's grievances could not be admitted into evidence unless Defendants opened the door on this issue, Plaintiff asked the Court, "You don't see the relevance of me getting

the courtroom's attention about what they are doing? That's what you are telling me for the record?" (*Id.* at p. 33). The Court then proceeded to warn Plaintiff that "one of the things we are going to have to make sure is we don't talk over one another, okay, because we have still got a lot to work through here." (*Id.* at p. 34).

After that conversation, Plaintiff inquired as to the status of his most recent motion for recruitment of counsel (*Id.*). The Court explained that his motion had been denied, which was not well-received by Plaintiff and led to the following exchange:

> PLAINTIFF: You forced me. I am going to get this for the record, too. You allowed them lawyers to withdraw from the case when I didn't take no settlement. Yes, you did. You allowed them to withdraw from the case. You allowed them lawyers and you forced me to go *pro se*. Yes, you did.
>
> THE COURT: Mr. Champ, we are in a courtroom. The Court's not going to tolerate any attacks on the integrity of the judicial process.
>
> PLAINTIFF: I'm just going by – I'm just going by what you did.
>
> THE COURT: Excuse me, Mr. Champ.
>
> PLAINTIFF: I'm just going by what you did.
>
> THE COURT: Mr. Champ, we are not going to talk over one another. The Court is not going to allow you to attack the integrity of the judicial progress. The Court has articulated its rulings in detailed decisions throughout the course of this case. And what I will caution you about is attacks on the judicial process, on the integrity of the judicial process, that won't be tolerated here or in front of the jury. If attacks on the integrity of the judicial process continue, the Court may have to consider the imposition of sanctions. And, I want to caution you that sanctions could include up to -- include the dismissal of this case.
>
> PLAINTIFF: I am taking everything to the media. It doesn't matter what you do. You allowed them to do something they had no business to do.

(*Id.* at pp. 35-36).

Subsequently, when questioned about how long Plaintiff anticipated needing to present his case during trial, Plaintiff responded by telling the Court to grant his motion for a polygraph because that is all he needed (*Id.* at p. 38).[3] This led to the following exchange:

> PLAINTIFF: The case could be over in one day if I get granted that motion and that polygraph. It could be over with and through the door. She needs to lose her job for standing up for them two.
>
> THE COURT: Mr. Champ, we are not going to do this. I have warned you once.
>
> PLAINTIFF: Everything's going to the media. So I am taking everything to Black Live Matters. The issues is going, everything is going. So, whatever you do, it's okay with me, because she did something that she's never supposed to did.
>
> THE COURT: Mr. Champ, we are not going to do this. I've warned you, I am trying to have a productive Final Pretrial Conference here. It requires us to work together, to work through these issues in order to have a trial in this case, and so you are going to have to answer my questions when I talk to you. And we are going to address our comments to the Court and we are not going to be throwing comments to opposing counsel about their integrity. I am directing them, they know not to levy comments to you, make comments to you, and I'm going to direct you not to do that again.

(*Id.* at pp. 38-39).

At a later point during the conference when Plaintiff raised his concerns about delays in receiving his mail, another notable exchange occurred:

> THE COURT: Yeah, as I've said, I understand your concern. I'm not aware of what's -- the internal operations of the facility.

---

[3] Plaintiff filed a document titled "Unsworn Declarations under Penalty of Perjury," in which he appears to request a polygraph (Doc. 190).

PLAINTIFF: You know what? Don't worry about it. Everything I am doing, whatever you do is going to the media. You will read about it just like everybody else.

THE COURT: Excuse me? Excuse me, Mr. Champ? As I have told you here today, I'm going to take a short recess. You're coming close to the line of where I may be forced to dismiss this case. Attacking the judicial process, attacking the integrity of the judicial process –

PLAINTIFF: You just told me you couldn't do nothing about that.

THE COURT: Excuse me. Mr. Champ, I'm talking, okay? This is one thing that I have talked to you about. We are not going to talk over each other. Attacking the integrity of the judicial process is not going to be tolerated, and you are coming very close to the line where I may be left with no other option but to impose sanctions.

(*Id.* at pp. 54-55).[4]

Thereafter, the Final Pretrial Conference proceeded without any additional issues. However, after the above noted exchange and until the conclusion of the Final Pretrial Conference, it appeared Plaintiff was either ignoring the remainder of proceedings or intentionally trying to avoid actively participating in the hearing. Finally, the Court concluded the Final Pretrial Conference by again warning Plaintiff that:

I expect the parties to conduct themselves professionally and appropriately in front of the jury and throughout the entire process. Mr. Champ, I have cautioned you and I feel that I have warned you enough that further behavior that occurred today, if that behavior occurs further at the trial of this case either in the courtroom with or without the jury, the Court will

---

[4] While this is not contained in the transcript, the Court did notice that when this recess occurred, Plaintiff declined to stand when the undersigned exited the Courtroom and the Courtroom Deputy had given the instruction of "All rise." Plaintiff likewise declined to stand when the undersigned re-entered the Courtroom after the recess and the Courtroom Deputy gave the instruction of "All rise." And finally, Plaintiff declined to stand when Court adjourned. At the time, the Court opted not to note this for the record as it did not want to inflame Plaintiff or create any additional disruptions. With the benefit of hindsight, perhaps the Court should have done so. Ultimately, the Court notes this, not as a matter of ego or self-importance, but because the Court believes that it is yet another reflection of Plaintiff's blatant contempt for the integrity of the judicial process.

consider the imposition of sanctions. And, so, this is the Court's last warning for you to behave appropriately and professionally at the trial setting of this case.

(*Id.* at pp. 67-68).

       c.   <u>Trial Preparations, February 10, 2025 Status Conference, and the Court's Order Dismissing Case</u>

Following the Final Pretrial Conference, the Court worked diligently to review and prepare an Order that ruled on the admissibility of the parties' anticipated evidence (Doc. 210). Meanwhile, on January 29, 2025, Plaintiff filed a document titled "Standby Counsel Violation," which accused the Court of violating his Sixth Amendment right to counsel by refusing to provide him with appointed counsel (Doc. 206). Two days later, Plaintiff filed a motion requesting a settlement conference (Doc. 208). The Court promptly granted that motion and appointed Court Attorney and ADR Coordinator Megan Arvola to serve as a mediator. However, the mediation session held on February 6, 2025, did not prove fruitful (Doc. 213). As such, the Court and parties continued to prepare for the February 11, 2025, trial setting. In addition, the Court addressed Plaintiff's "Standby Counsel Violation" document by again explaining that he had no right to another court appointed attorney and "his references to a criminal defendant's Sixth Amendment right to counsel are entirely inapplicable." (Doc. 214) (citing *Williams v. DeJoy*, 88 F.4th 695, 703 (7th Cir. 2023)).

The Court set a Status Conference for February 10, 2025, to discuss a few remaining logistical issues prior to trial, and also to inform the parties of the Court's anticipated plans for conducting the trial in the event of bad weather that was then forecasted for

February 11 and 12, 2025 (Doc. 215). Initially, the Status Conference proceeded smoothly, and the Court and parties swiftly addressed all the topics the Court intended to cover (*see* Doc. 218 at pp. 1-7). However, when the Court provided the parties with an opportunity to ask any questions they may have had, things quickly fell apart. While the following exchange is lengthy, the Court believes it is necessary to truly and fully capture Plaintiff's behavior that led to the ultimate sanction of dismissal:

> THE COURT: Any questions right now?
> PLAINTIFF: So you still want me to go to trial without a lawyer, right?
> THE COURT: Excuse me?
> PLAINTIFF: You still want me to go to trial without a lawyer? You still violating my constitutional right?
> THE COURT: Mr. Champ, this case is set for trial tomorrow morning -- jury trial to begin tomorrow morning; and yes, we will convene with trial tomorrow morning. As I've explained to you in the past -- and I'm not going to rehash it again here -- your attorney moved to withdraw citing irreconcilable differences as well as differences in terms of trial strategy. The Court ultimately granted that motion to withdraw. This is a civil case, and there's no constitutional right to an attorney in a civil case; and so once your recruited attorney was permitted to withdraw, the Court looked at the case law and determined it would not recruit yet another attorney to assist you in this case, so yes, this case will be proceeding to trial tomorrow.
> PLAINTIFF: You allowed him to withdraw because I didn't take no settlement. Yes, you did. For the record, you did that.
> THE COURT: Mr. Champ, you have already made your record clear, and the Court will --
> PLAINTIFF: Well, I'm going to keep making it clear because that's my 6th Amendment right. I'm going to keep making it clear.
> THE COURT: As the Court has already explained to you, the 6th Amendment Right to Counsel does not apply in civil cases. There is no right -- there is no constitutional right to an attorney in civil cases. That's a benefit the Court afforded you in recruiting an attorney to represent you.
> PLAINTIFF: But you allowed him to withdraw without his doing his due diligence, whatever he was doing with the rest of the case. Yes, you did. You allowed him to withdraw.
> THE COURT: Mr. Champ --
> PLAINTIFF: -- whatever he was --
> THE COURT: Mr. Champ

PLAINTIFF: -- doing he --

THE COURT: Mr. Champ --

PLAINTIFF: -- wasn't even through whatever he was doing.

THE COURT: Mr. Champ, I've cautioned you enough that if you continue down this path the Court will impose sanctions, and the sanction that the Court will impose is the dismissal of your case with prejudice.

PLAINTIFF: You know what, you can do that. Because when I get out, like I tell you, like I told the state, stuff like I got, the media is going to help me bring this back anyway. So you'll be wasting my time and their time to even try to have me in your courtroom tomorrow. I'll deal with this when I get home.

THE COURT: Mr. Champ, my goal is to provide you a trial tomorrow, and a fair trial --

PLAINTIFF: No, you're –

THE COURT: -- and to --

PLAINTIFF: -- not providing me nothing. You are violating my 6th Amendment right, and that's not gonna happen. I know my constitutional rights. You allowed the lawyer to withdraw without him finishing the job that he was doing. I didn't take no settlement. Wasn't nothing explained to me. Then after it wasn't explained to me, you denied this lawyer -- allow to withdraw without him doing his job like he's supposed to.

THE COURT: Mr. Champ, we've gone over this before, and --

PLAINTIFF: But you ignore me. You act like you ignore me. You instructed to follow the law like you're supposed to, but you are ignoring my issues, but these issues wasn't coming up when I had this lawyer. Now since you are forcing me to go pro se, it's a problem.

THE COURT: Mr. Champ, nobody is forcing you to go pro se; and as I explained to you previously, my goal was always to provide you a fair trial tomorrow and to bring the jury in to allow you to have your --

PLAINTIFF: No, you never –

THE COURT: -- day in court.

PLAINTIFF: -- you're not denying me no fair trial. I asked for a polygraph, and you never -- you never said nothing. Declaration, you never said nothing about that.

THE COURT: Mr. Champ, you're leaving me no choice --

PLAINTIFF: Because once I take that polygraph --

THE COURT: -- but to consider --

PLAINTIFF: -- that will end everything. That would end everything.

THE COURT: You're leaving me no choice but to consider the imposition of sanctions against you, and --

PLAINTIFF: The sanctions, it --

THE COURT: -- that would be the dismissal of your case.

PLAINTIFF: -- doesn't matter. The media will help me bring this back. I'm not worried about that. So you do what you feel, but remember, you will be sanctioned when I take this to the media, the stuff that I have, yes. So you actually think I'm sitting here telling you that just to be telling you that, and I'll be going through this all these years?

THE COURT: Excuse me?

PLAINTIFF: You think I'm sitting here telling you that after I have been going through that all the years? I keep a journal of everything that go on -

THE COURT: Okay.

PLAINTIFF: -- from the time I put my case up to now.

MR. COURT: And, certainly, you're entitled to do that.

PLAINTIFF: Don't worry about it. The media gonna love it. I got cousins, Sun-Times in Chicago, Kankakee, Joliet, Danville and Decatur. All of them going to help bring this stuff to the media attention. Everything. Everything. From the judge that censors me, everything will be brung up. Everything.

THE COURT: Well, Mr. Champ, my -- as I told you, my goal --

PLAINTIFF: I'm going to do what I got to do. You do what you do.

THE COURT: Okay. As I told you, my goal was always to provide you a fair and --

PLAINTIFF: I'm not trying to get at –

THE COURT: -- impartial trial tomorrow –

PLAINTIFF: I'm not trying to --

THE COURT: You know what, we're not –

PLAINTIFF: You, you, you denied –

THE COURT: We're not going to talk over --

PLAINTIFF: -- me a lawyer after him withdrawing from the case. He did not finish doing what he was doing.

THE COURT: Mr. Champ, we're not going to talk over one another. I think you've made your record sufficiently clear, this case and how you feel about this case and how you feel about the judicial process. As I indicated to you, my goal was –

PLAINTIFF: This is a joke –

THE COURT: -- to provide you --

PLAINTIFF: -- that's what it is. This is a joke. Do what you got to do.

THE COURT: Here's what we're going –

PLAINTIFF: Do what you got to do. Let them know that I'm not coming to court tomorrow. That's what you doing.

THE COURT: Okay. So know you're --

PLAINTIFF: I will deal with you with the media.

THE COURT: Now you're telling me you're not coming to court tomorrow?

PLAINTIFF: No, I ain't coming to court. You let them -- please let them know. There's a CO right here.

THE COURT: Okay, all right. Mr. Champ, we're going to terminate this
conference. The Court will be entering an order here very shortly. Given
now that you've represented to me that you won't even attend the trial if I
hold the trial tomorrow, and --
PLAINTIFF: I'm going to tell you my constitutional rights are being
violated --
…
THE COURT: We're going to end this conference then, and the status
conference is over.
PLAINTIFF: Yeah, I see you in the media when I get home.

(*Id.* at pp. 7-14).

Consequently, a few hours later the Court entered an Order dismissing Plaintiff's

case with prejudice and cancelling the jury trial scheduled for the following day (Doc.

217). As explained in that Order, the Court found the extreme sanction of dismissal with

prejudice to be warranted because of both Plaintiff's entirely unacceptable conduct made

in blatant disregard to the Court's repeated warnings, and Plaintiff's statements that he

would not attend trial the following day (*Id.*). All of this occurred on the eve of trial and

in less than 24 hours, approximately 30 jurors were expected to report for jury duty.

Accordingly, the Court believed it was necessary to formally notify the parties that it was

sanctioning Plaintiff with the dismissal of his case and cancelling the jury trial. Because

time was of the essence, the Court simply prepared a short Order on February 10th and

indicated it would issue a more detailed Order (*i.e.*, this Order) to fully explain Plaintiff's

misconduct, the Court's warnings, and the reasons underpinning the imposition of the

sanction of dismissal with prejudice (*Id.* at p. 4).

## II.    _Analysis_

### a.    _Sanction Standards_

It is well recognized that "a court has the inherent authority to manage judicial proceedings and to regulate the conduct of those appearing before it." _Ramirez v. T&H Lemont, Inc._, 845 F.3d 772, 776 (7th Cir. 2016) (citing _Chambers v. NASCO, Inc._, 501 U.S. 32, 46–50 (1991)). "Pursuant to that authority, [the court] may impose appropriate sanctions to penalize and discourage misconduct." _Ramirez_, 845 F.3d at 776. However, the Court should exercise its authority sparingly and "only when other rules do not provide sufficient basis for sanctions." _Outley v. City of Chicago_, 648 F. Supp. 3d 996, 1010 (N.D. Ill. 2022).

"Although dismissal is indeed a hefty sanction, 'the most severe in the spectrum of sanctions provided by statute or rule must be available . . . to penalize those whose conduct may be deemed to warrant such a sanction . . . .'" _Greviskes v. Universities Research Ass'n, Inc._, 417 F.3d 752, 759 (7th Cir. 2005) (quoting _Nat'l Hockey League v. Metro. Hockey Club, Inc._, 427 U.S. 639, 643 (1976)). A dismissal pursuant to the court's inherent authority must be premised on a finding that the culpable party willfully abused the judicial process, acted in bad faith, or engaged in misconduct. _Ramirez_, 845 F.3d at 776; _Tucker v. Williams_, 682 F.3d 654, 662 (7th Cir. 2012). The court should also consider "the egregiousness of the conduct in question in relation to all aspects of the judicial process" and "whether less drastic sanctions are available." _Fuery v. City of Chicago_, 900 F.3d 450, 464 (7th Cir. 2018) (citations omitted). "But a district court's inherent power to sanction for violations of the judicial process is permissibly exercised not merely to remedy

prejudice to a party, but also to reprimand the offender and to deter future parties from trampling upon the integrity of the court." *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (internal quotation marks and citations omitted).

### b.  *The Sanction of Dismissal with Prejudice is Warranted*

Here, the Court finds the sanction of dismissal with prejudice is warranted for two independent reasons. First, this sanction is warranted because of Plaintiff's repeated misconduct done in blatant disregard to the Court's repeated warnings. Second, this sanction is warranted based upon Plaintiff's unequivocal statement that he would not attend the jury trial as scheduled. The Court expands upon each of these reasons in turn.

### i.  *Plaintiff's Misconduct*

Quite simply, the record is replete with examples of Plaintiff's misconduct and failure to comply with Court Orders and warnings. As detailed above, prior to his appointment of counsel, Plaintiff was cautioned that he must comply with Court Orders and the Federal Rules of Civil Procedure after he failed to participate in his deposition (Doc. 78 at p. 2). Years later, after Plaintiff's Court-appointed counsel was permitted to withdraw (Doc. 153)[5], Plaintiff's conduct took a sharp turn for the worse. At the Final Pretrial Conference, Plaintiff committed numerous actions unbefitting of a litigant before the Court, including: (1) interrupting the Court multiple times, both before and after he

---

[5] The Court's Order explaining the reasons for granting Mr. Murphy's withdrawal and denying Plaintiff's motion to appoint new counsel explains in detail why both of those determinations were supported (*see* Doc. 153). As such, the Court will not rehash those arguments or devote additional time to explaining this point, as the Court has already done so on numerous occasions (*Id.; see also* Docs. 202, 214, 218). Suffice it to say, Plaintiff's comments blaming the undersigned for Mr. Murphy's withdrawal and/or Plaintiff's own failure to obtain counsel are entirely unfounded and unsupported.

was warned not to do so; (2) criticizing the Court for finding Plaintiff's grievance records to be inadmissible absent a compelling reason for their introduction; (3) accusing the Court of forcing him to proceed without a lawyer; (4) indicating on multiple occasions that he was going to take "everything to the media" and "[i]t doesn't matter what [the Court] do[es]"; (5) refusing to answer the Court's questions and instead demanding the Court grant his motion for a polygraph; (6) asserting that Defense Counsel "needs to lose her job" solely for representing her clients in this case; and (7) failing to observe even the most basic courtroom etiquette by both ignoring ongoing proceedings and refusing to rise as instructed (*see generally* Doc. 220).

Moreover, this misconduct did not occur in a vacuum. Rather, Plaintiff was warned on multiple occasions that his conduct was improper and to stop interrupting the Court and attacking the integrity of the judicial process (*Id.*). The Court's warnings even expressly cautioned Plaintiff about the potential for a dismissal of this action with prejudice if his belligerent behavior continued (*see, e.g.*, *Id.* at p. 36). In hindsight, given Plaintiff's entirely inappropriate comments and accusations at the Final Pretrial Conference, in combination with his failure to heed the Court's warnings, the dismissal of this action with prejudice was likely an appropriate sanction after that hearing.

Nevertheless, the Court attempted to proceed with the trial as scheduled in hopes that Plaintiff could conduct himself appropriately after being repeatedly warned of the possibility of sanctions. Moreover, the Court hoped to achieve a resolution of this case on the merits. In fact, the Court went above and beyond its typical pretrial responsibilities by: (1) drafting an Order that further detailed pretrial deadlines and Plaintiff's

responsibilities (Doc. 196); (2) taking additional steps to ensure Plaintiff was provided
with street clothes for trial (Doc. 205); (3) reviewing the parties' anticipated evidence and
making determinations as to the admissibility of that evidence (Doc. 210); and (4)
granting Plaintiff's request for a last minute mediation and ordering the parties to
mediation with the Court Attorney/ADR Coordinator (Docs. 209, 211, 213). Moreover,
the Court even issued another Order that warned "Plaintiff that he will face sanctions if
he makes any further statements attacking the integrity of the judicial process" or
accusing the undersigned of forcing him to proceed *pro se* (Doc. 214).

Undeterred by the Court's warnings, Plaintiff's conduct at the February 10, 2025,
status conference was belligerent, combative, antagonistic and entirely inexcusable (*see
generally* Doc. 218). Plaintiff began by repeatedly accusing the undersigned of violating
his constitutional rights and having ulterior motives for allowing his recruited attorney
to withdraw, ignoring the Court's repeated explanations and warnings on this subject.
Plaintiff continued by raising his voice and repeatedly interrupting the Court. This
occurred to such an extent that the undersigned could not even finish issuing a warning
to Plaintiff or subsequently, even orally issue the sanction of dismissal with prejudice.
Furthermore, while the Court has attempted to construe Plaintiff's statements in as fair a
light as possible, Plaintiff's repeated claims that the Court will deal with the
repercussions of its rulings when he is released and able to contact the media are
troubling to say the least (*see, e.g.*, Doc. 218 at p. 14). And again, these veiled threats and
Plaintiff's repeated interruptions and accusations were made in direct disregard of the
Court's numerous oral and written warnings. Put simply, there can be no argument

whatsoever that Plaintiff was unaware of this potential sanction, or that his misconduct was a one-time mistake. For all these reasons, the Court finds that the sanction of dismissal with prejudice was and is the only appropriate sanction.[6] *See Hughes v. Varga*, 21-1215, 2021 WL 3028145, at *2 (7th Cir. July 19, 2021) ("For completeness we emphasize that Hughes's horrific behavior easily supports dismissal with prejudice as a sanction."); *Pyramid Energy, Ltd. v. Heyl & Patterson, Inc.*, 869 F.2d 1058, 1062 (7th Cir. 1989) ("A trial court is entitled to say, under proper circumstances, that enough is enough, *Tolliver*, 786 F.2d at 319, and less severe sanctions than dismissal need not be imposed where the record of dilatory conduct is clear.").

## ii.  *Plaintiff's Refusal to Attend Trial*

While the Court has no doubts that Plaintiff's repeated misconduct alone justifies the sanction of dismissal with prejudice, the Court further notes that Plaintiff's representations that he would not attend his own trial provide an additional, independent justification for this sanction. Undoubtedly, neither the Court, the jury, nor Defendants should be required to expend additional time and resources preparing for

---

[6] Furthermore, as noted in the Court's Order Dismissing Case With Prejudice (Doc. 217), Plaintiff is proceeding in forma pauperis (Doc. 8) and is currently incarcerated. As such, the Court has considered, but ultimately rejected, the imposition of lesser sanctions because nothing short of the dismissal of this action with prejudice could adequately preserve the integrity of the judicial system and ensure that Plaintiff does not engage in further misconduct. *See Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993) ("Misconduct may exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court."). Furthermore, the Court researched whether it could conduct the trial and exclude Plaintiff from the courtroom if and when misconduct occurred. However, given that Plaintiff is representing himself, excluding him would also mean excluding his "lawyer" – something the Court believes is untenable in this situation. *See Verser v. Barfield*, 741 F.3d 734, 739 (7th Cir. 2013) ("When a plaintiff is acting *pro se*, however, the court must take into account the fact that excluding him from the courtroom necessarily also excludes his 'lawyer.'"). Accordingly, the Court readily concludes that conducting a trial without the *pro se* Plaintiff present at all times is not a viable option.

and appearing at a civil trial that Plaintiff initiated but subsequently indicated he will not attend.

"The sanction of dismissal has been imposed for failure to comply with pre-trial settings." *Link v. Wabash R. Co.*, 291 F.2d 542, 546 (7th Cir. 1961). Here, Plaintiff's unequivocal statement that he would not come to court for the trial, even after numerous prospective jurors have been summoned and the Court and Defendants have worked tirelessly to prepare for trial, is an even stronger justification for imposing the sanction of dismissal than was discussed in *Link*. As such, whether characterized as a sanction of dismissal pursuant to the Court's inherent authority, or a dismissal based upon Plaintiff's failure to prosecute, Plaintiff's unequivocal statement that he would not attend trial is an additional, independently sufficient justification for the Court's dismissal of this action with prejudice.[7] *See Lucien v. Breweur*, 9 F.3d 26, 29 (7th Cir. 1993) ("One way in which a plaintiff can fail to prosecute his case is by disobeying a discovery order and another way is by disobeying an order to attend a preconference hearing. A determination that by disobeying either type of order the plaintiff failed to prosecute his suit and that the suit should be dismissed with prejudice as a sanction for that failure is equivalent to a determination that the disobedience of such an order should be visited with the sanction of dismissal by the force of Rule 37(b) directly or as incorporated into Rule 16, without reference to 41(b).").

---

[7] As outlined above (*supra*, pp. 12-13), when Plaintiff stated that he would not be coming to Court for his trial, the Court followed up with Plaintiff on this and Plaintiff reiterated in no uncertain terms that he would not attend Court for his trial (*see also* Doc. 218 at pp. 13-14).

III.    _Conclusion_

For the reasons stated above, this action is DISMISSED with prejudice as a sanction for Plaintiff's repeated misconduct, as well as his representations that he would not attend the trial as scheduled and ordered. This case is CLOSED, and the Clerk of Court is DIRECTED to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:  February 14, 2025**

<u>s/ Mark A. Beatty</u>
**MARK A. BEATTY**
**United States Magistrate Judge**

<u>**NOTICE**</u>

If Plaintiff wishes to contest this Order and the Court's Order Dismissing Case (Doc. 217), he has two options. He can ask the Seventh Circuit to review the order, or he can first ask the undersigned to reconsider the Order before appealing to the Seventh Circuit.

If Plaintiff chooses to go straight to the Seventh Circuit, he must file a notice of appeal _within 30 days_ from the entry of judgment. FED. R. APP. P. 4(a)(1)(A). The deadline can be extended for a short time only if Plaintiff files a motion showing excusable neglect or good cause for missing the deadline and asking for an extension of time. FED. R. APP. P. 4(a)(5)(A), (C). _See also Sherman v. Quinn_, 668 F.3d 421, 424 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); _Abuelyaman v. Illinois State Univ._, 667 F.3d 800, 807 (7th Cir. 2011) (explaining the excusable neglect standard). The current cost

of filing an appeal with the Seventh Circuit is $600.00. The filing fee is due at the time the notice of appeal is filed. FED. R. APP. P. 3(e). If Plaintiff cannot afford to pay the entire filing fee up front, he must file a motion for leave to appeal *in forma pauperis* ("IFP motion") along with a recent statement for his prison trust fund account. *See* FED. R. APP. P. 24(a)(1)(C). The IFP motion must set forth the issues Plaintiff plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C).

On the other hand, if Plaintiff wants to start with the undersigned, he should file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). The motion *must* be filed within twenty-eight (28) days of the entry of judgment, and the deadline *cannot* be extended. FED. R. CIV. P. 59(e); 6(b)(2). The motion must also comply with Rule 7(b)(1) and state with sufficient particularity the reason(s) that the Court should reconsider the judgment. *Elustra v. Mineo*, 595 F.3d 699, 707 (7th Cir. 2010); *Talano v. Nw. Med. Faculty Found., Inc.*, 273 F.3d 757, 760 (7th Cir. 2001). *See also Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012) ("To prevail on a Rule 59(e) motion to amend judgment, a party must clearly establish (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment.") (citation and internal quotation marks omitted).

So long as the Rule 59(e) motion is in proper form and submitted on-time, the 30-day clock for filing a notice of appeal will be stopped. FED. R. APP. P. 4(a)(4). The clock will start anew once the undersigned rules on the Rule 59(e) motion. FED. R. APP. P. 4(a)(1)(A), (a)(4), (a)(4)(B)(ii). To be clear, however, if the Rule 59(e) motion is filed outside the 28-day deadline or "completely devoid of substance," the motion will not stop the

clock for filing a notice of appeal; it will expire 30 days from the entry of judgment. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Talano v. Northwestern Medical Faculty Foundation, Inc.,* 273 F.3d 757, 760–61 (7th Cir. 2001); *Martinez v. Trainor,* 556 F.2d 818, 819–20 (7th Cir. 1977). And again, the deadline for filing a notice of appeal can be extended only on a written motion by Plaintiff showing excusable neglect or good cause.